UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FILED
*S.A.N.*
12 MAR 15  PM 4: 21

MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA,
*ex rel.* JOSEPH J. MEDOLLA,

    Plaintiff,

vs.

ADVANCED BIOHEALING, INC.,

    Defendant.

CASE NO. 8-12-CV-575-T-33TBM

FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)
DO NOT PLACE IN PRESS BOX OR
ENTER ON PUBLICALLY
ACCESSIBLE SYSTEM

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

1.    Joseph J. Medolla (hereinafter "Relator" or "Medolla") brings this action on behalf of the United States of America to recover damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, against the Defendant, Advanced BioHealing, Inc. ("ABH"). The violations detailed below arise out of Defendant's actions which caused the submission of false claims for payment to Medicare and other federally-funded government health care programs for the treatment of diabetic foot ulcers with Defendant's product known as, Dermagraft.

2.    This Complaint details a nationwide marketing scheme employed by ABH to unlawfully induce physicians and other health care providers to use its Dermagraft product in the treatment of diabetic foot ulcers. ABH's marketing scheme was to provide illegal incentives, remuneration, and inducements to physicians, wound care centers, hospitals, and the staff affiliated with each in an elaborate scheme to build relationships with them and then "leverage" those relationships to induce physicians and other health care providers to use their Dermagraft product. ABH's central tenant in marketing Dermagraft was to get its sales representatives to "show the love" to the physicians, their staff, and other health care providers who treated

diabetic foot ulcers and who, in turn, could use the Dermagraft product for the treatment of wounds.

3.      To "show the love," ABH sales staff continually showered physicians and staff with a whole host of incentives and inducements such as expensive dinners, tickets to sporting events, happy hours, visits to the spa, boat trips, gift cards, honorariums, hunting trips, and breakfasts and lunches for staff at their offices.  In addition to "love," ABH sought to "partner" with physicians and staff whereby ABH sales representatives would provide "services" to assist the practice in such matters as handling the paperwork related to insurance verification; guaranteeing credits to the practice if the insurer refused, after being verified, to provide coverage; providing free dressings to physicians to use in applying Dermagraft to ulcers; conducting patient file reviews to ensure proper coding and thus reimbursement; and even providing the physician and practices with summaries to demonstrate how much revenue they were making by using the Dermagraft.

4.      By "partnering" with the physicians and "showing the love," ABH sales representatives formed close relationships with physicians and their staffs, who in turn, permitted them to promote and control the use of Dermagraft at the provider's practice by allowing ABH to (1) identify potential patients who suffered from diabetic foot ulcers and who might be suitable for Dermagraft treatment; (2) determine in advance of treatment being ordered whether the potential patient's insurer – overwhelmingly, Medicare – would pay for Dermagraft treatment in the event that a doctor prescribed it; (3) to learn when potential patients would have appointments and then to be there to pressure the physician to use the Dermagraft treatment and to continue using it until the maximum extent allowed by insurance; and (4) working closely with health care providers to insure and demonstrate to them the possibility of using Dermagraft

by providing assistance with billing, coding, and reports on revenue earned as a result of Dermagraft usage. By employing this marketing strategy to promote the use of its product, ABH violated the Anti-Kickback Act, 42, U.S.C. § 1320(a)-7(b), by providing illegal incentives to physicians and other health care providers, causing them in turn to submit false claims for reimbursement to Medicare and other federally funded health care programs.

5.      By causing physicians, wound care centers, and other health care providers to submit false claims for reimbursement to Medicare and other federally funded health care programs, ABH violated the False Claim Act, 31 U.S.C. § 3729, et seq. The False Claims Act, 31 U.S.C. § 3729, *et seq.*, provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to the federal government or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim that was made to the federal government is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of damages sustained by the federal government.

6.      The False Claim Act allows any person having information regarding a false or fraudulent claim against the federal government to bring an action for himself (the "Relator") and for the federal government and to share in any recovery by the government. The complaint is filed under seal for sixty days (without service on the defendants during that period) to enable the federal government: (a) to conduct its own investigation without the defendants' knowledge; and (b) to determine whether to join the action.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and 28 U.S.C. § 1345 and 31 U.S.C. § 3730(b).

8.      The Court has personal jurisdiction of the Defendant because the Defendant does business and is located in this district.

9.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the acts prescribed by 31 U.S.C. § 3729, *et seq*. and complained of herein took place within this district, including in Pinellas and Hillsborough Counties, and is also proper pursuant to 28 U.S.C. § 1391(b) because at all relevant times Defendant transacted business in this district.

## PARTIES

10.     The real party in interest to the claims set forth herein is the United States of America.

11.     Relator, Joseph J. Medolla, works for Defendant, ABH, as a sales representative in the Tampa Bay region.  ABH hired Medolla in February, 2011, and at present he remains employed by the company.

12.     Relator Medolla brings this action based upon his direct, independent, and personal knowledge.  He personally observed the Defendant's practices described here and was privy to meetings, conversations, and other internal communications regarding the same.  In the regular course of his job duties, he also had access to email, internal documents and data which reflected the conduct discussed herein, including communications and documents circulated among ABH's sales force.  In the course of his job duties at ABH, Relator Medolla had many interactions with managers, employees, sales representatives, physicians, and other health care providers relating to Defendant's business practices.  His close interaction with such persons support and confirm the allegations herein.

13.     Advanced BioHealing, Inc., a subsidiary of Shire PLC, is a biopharmaceutical company that specializes in the development and commercialization of regenerative medicine

therapies.  ABH manufactures and markets DERMAGRAFT®, a bioengineered skin substitute approved by the FDA for the treatment of diabetic foot ulcers, which assists in restoring damaged tissue and supports the body's natural healing process.  ABH was founded in 2004 to develop and commercialize bioengineered tissue products, and it acquired the rights to Dermagraft in May, 2006.  ABH began selling Dermagraft to US customers in February, 2007. ABH has over 500 full time employees, and is sold in the Tampa Bay area, in Florida, and throughout the United States.  ABH is headquartered in Westport, Connecticut, and has a large manufacturing plant in La Jolla, California.  In 2011, Dermagraft had sales in the United States of $195.6 million, and according to a press release by its parent company, Shire, in 2010 Dermagraft achieved a 5% market share of the $3 billion market in slow healing diabetic foot ulcers.

14.     Shire PLC is a leading specialty biopharmaceutical company headquartered in Ireland.  Shire's products are marketed in 50 countries worldwide, and it has offices in over 29 countries.  Shire acquired ABH in June of 2011 for $750 million.

## STATUTORY AND REGULATORY ENVIRONMENT

### A. THE ANTI-KICKBACK ACT

15.     Under the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration (including any kickback, bribe, or rebate ) directly or indirectly, overtly or covertly, in cash or in kind in exchange for the referral of any product or service for which payment is made from any federally funded health care program, including Medicare, Medicaid, TRICARE,[1] and the Veterans Health Administration ("VHA"). Additionally, the Anti-Kickback Act makes it unlawful to knowingly solicit or receive any remuneration, directly or indirectly, overtly or covertly, in cash or in kind in return for referring

---

[1]  TRICARE is the federal health care program serving military service members, retirees and their families.

an individual to a person for the furnishing or arranging for the furnishing of any product, item or service for which payment is made in whole or in part under a federal health care program or in return for purchasing or arranging for or recommending purchasing any product, good, service or item for which payment may be made in whole or in part under a federal health care program.

16.     The Anti-Kickback Act is designed to ensure that patient care will not be improperly influenced by inappropriate compensation from the health care industry.

17.     Each of the federally funded health care programs requires every provider who seeks payment from Medicare or other federally funded programs to promise and ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of health care services in the United States.

18.     The Anti-Kickback Act prohibits medical device manufacturers and suppliers from compensating, in cash or in kind, or providing services to a physician or member of the physician's staff when one purpose of the compensation or the service is to influence the physician's use of its product.   The simple question is whether a vendor, such as ABH, is providing anything of value, including services, for the purpose of inducing the purchase of Dermagrafts, the purchase of which is reimbursed by a federal health care program?

19.     Examples of activities prohibited by the Anti-Kickback Act include payments for sham consulting services, bogus research and educational grants, bogus speaking fees, lavish entertainment, travel and lodging expenses, expensive meals and wine, and other gifts and discounts.   These activities are especially suspect if the medical device supplier selects the physician based on its belief that the physician is likely to prescribe the company's products rather than on the physician's professional qualifications for services he or she actually rendered to the company – a common practice at ABH.

20.     The Anti-Kickback Act provides certain "safe harbors" to exclude certain conduct from its ambit, as long as the involved parties have strictly complied with all the conditions of the safe harbor.  The incentives and other gifts paid and provided by ABH to physicians or their staffs do not fall within the scope of the safe harbor regulations because ABH's incentives provided to physicians and their staffs are intended to induce physicians to use ABH's Dermagraft product and are not made for a commercially reasonable business purpose.

## B. REIMBURSEMENT BY GOVERNMENT-FUNDED HEALTHCARE PROGRAMS

21.     The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act ("SSA").  The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid studies ("CMS"), a component of HHS.

22.     The Medicare program consists of two parts:  Part A and Part B.  Medicare Part A is hospital insurance that provides basic coverage for hospital stays and post hospital nursing facilities, home healthcare, and hospice care for terminally patients.  Most people automatically receive Part A when they turn 65.  Medicare Part B is medical insurance, and it covers physician services, supplies and services incident to physician services, lavatory services, outpatient therapy, diagnostic services, and radiology services.

23.     Various other federally-funded medical coverage programs exist to help discreet populations of enrollees obtain medical care, including the Civilian Health and Medical Programs of the Uniformed Services ("CHMPUS"), TRICARE, and The Veterans Health Administration, among others.

24.     Reimbursement practices under all federal-funded healthcare programs are closely aligned with the rules and regulations governing Medicare reimbursement.

25.    Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. In this capacity, the carriers act on behalf of CMS.

26.    Medicare reimburses hospitals for in-patient and out-patient health care services provided to Medicare beneficiaries pursuant to what is known as the "prospective payment system" ("PPS"). With certain exceptions, PPS reimburses hospitals for in-patient and certain out-patient services according to a per-patient standardized rate called the diagnostic related group ("DRG") rate.

27.    Hospitals submit claims for interim reimbursements for services delivered to specific Medicare beneficiaries during their hospital stays. As a prerequisite to payment, CMS requires hospitals to submit annually what is known as the Hospital Cost Report. The cost report is a provider's final claim for payment from the Medicare Program for the services rendered to program beneficiaries for the period it covers. The cost report includes all of the providers costs, accounts for them under applicable provisions of the Medicare Statute and Regulations and HCFA Program Instructions, and results in a claim for a total amount of program reimbursement for the fiscal year.

28.    Medicare reimburses physicians for their professional services under Part B of the program, pursuant to a Physician Fee Schedule ("PFS"). Physician fees under the PFS are determined according to a standardized coding system assigned to procedures set forth in the healthcare financing administrations' common procedure coding system ("HCPCS").

29.    Under the HCPCS, standardized codes called Current Procedural Terminology ("CPT") codes, are assigned to various procedures. CPT codes are maintained by the American Medical Association, and CPT code set was adopted by CMS for the reporting of services under

Part B of the Medicare Program.  The CPT code set accurately describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payor for administrative, financial, and analytical purposes.

30.     The CPT code assigned to a medical procedure determines the payment amount to physicians under Part B.  The payment amount for each service is paid according to a physician fee schedule.

31.     The DRG system established standardized payments for Part A (in-patient) services, and the CPT system established a standardized payment amount for physician services, based on evaluation of the actual average cost of performing that procedure, by region and type of provider as reported by providers annually.

32.     Medicare and other federally funded health care programs, including the TRICARE and the Veterans Health Administration, will reimburse providers for their use of and treatment with Dermagraft.  To obtain reimbursement from Medicare or other federal healthcare programs, physicians, wound care centers, and hospitals who use or treat patients with Dermagraft must submit claims for each patient who was treated with Dermagraft.

**Compliance with the AKA Is a Condition of Payment By Federal Health Care Programs**

33.     Compliance with the Anti-kickback Statute is a condition of payment by any federally-funded healthcare programs, including Medicare, Medicaid, and TRICARE.  If a provider tells CMS or its agent that it provided services in violation of the Anti-kickback Statute, CMS will not pay the claim.

34.     For example, for Medicare, hospitals and physicians to enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the

Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from federal health care programs, the provider must sign a certification statement such as the following:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare. *See* Form CMS-855A (institutional providers); Form CMS-855B (clinics and group practices); Form CMS-855I (physician and non-physician practitioners).[2]

35.     When a hospital submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-Kickback Act.

36.     When a physician submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-Kickback Act.

37.     Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

38.     The CMS Form 2552 Hospital Cost Report certification page includes the following statement:

---

[2]  The Medicare Enrollment Application (CMS 855I) for physician's and non-physician practitioners is slightly different than the enrollment form for hospitals:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

39.     The cost-report certifier is also required to certify that:

To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

40.     As a result of the systematic payment of illegal incentives and inducements to physicians, wound care centers, hospitals, and their staffs that were made with the intent and effect of inducing these providers to use Dermagraft, ABH caused these providers to submit claims in violation of the conditions of payment and with false certifications to the United States. Claims submitted as a result of the illegally-induced use of Dermagraft are false claims.

**DERMAGRAFT AND THE TREATMENT OF DIABETIC FOOT ULCERS**

41.     Diabetic foot ulcers are open sores or ulcers on the feet. These chronic wounds develop on the feet or lower extremities of people that suffer from diabetes and the poor healing of wounds that is often characteristic of that disease. According to Shire and ABH, studies of diabetic patients estimate that they have a 15-25% life time risk of developing a diabetic foot ulcer and that roughly 2% of such patients develop diabetic foot ulcers each year. Studies estimate further that there are 538,000 cases of slow healing diabetic foot ulcers annually in the United States. Diabetic foot ulcers can result in serious complications, including amputation, and it is estimated that between 14-24% of patients who develop a diabetic foot ulcer will require an amputation.

42.     Patients suffering from diabetic foot ulcers are typically elderly, frequently overweight, and often suffer from other co-morbidities.

43.     In Medolla's experience, over 80% of the patients who were treated with Dermagraft were covered by Medicare, and that was not at all uncommon given that most patients suffering from diabetic foot ulcers are elderly and thus Medicare eligible.  According to Shire PLC, Medicare provides 100% coverage for Dermagraft in all states,[3] and Dermagraft has a "favorable reimbursement profile" with Medicare, the Veteran's Administration, numerous Medicaid programs, as well as private insurance plans.

44.     Diabetic foot ulcers, according to Shire, are treated by specialist physicians and wound care centers, select physician's offices, Veteran's Affair Medical Centers and clinics.  In Medolla's experience, podiatrists and vascular surgeons were the majority of physicians who treated diabetic foot ulcers with Dermagraft.  In turn, Dermagraft treatment was most frequently administered at out-patient wound care centers affiliated with hospitals and in some instances at the hospital itself.  (Physicians, their offices, wound care centers, and hospitals are collectively referred to herein as "health care providers" or "providers").

45.     One of the treatments for chronic diabetic foot ulcers is the use of what is sometimes termed, "artificial skin grafts" but should be more accurately termed as "bio-engineered skin grafts," as Dermagraft and other similar products are actually cultivated from human cells known as "fibroblasts."  According to a study on the clinical literature of such grafts, "artificial skin grafts promote wound closure, resulting in more frequent and rapid healing of chronic diabetic foot uclers, when compared with standard therapy."  The use of such artificial

---

[3]  Shire's reference to "100% coverage" means that Medicare provides reimbursement for Dermagraft in all states. Most often, however, Medicare Part B reimbursed Dermagraft for only 80% of the total cost of Dermagraft treatment.  The "ideal" patient for ABH, therefore, was one who was covered by Medicare and who had secondary insurance to cover the 20% balance that Medicare did not cover.

skin increases costs in the short term, but may result in long term cost savings when compared with conventional wound care treatments. The two main skin graft products are Dermagraft, made by ABH, and Apligraf, which is made by Organogenesis, Inc.

46.     Dermagraft is a regenerative bio-engineered skin substitute that assists in restoring damaged tissue, and is classified by the U.S. Food & Drug Administration as a medical device. Dermagraft consists of living skin cells in a bio-absorbable mesh scaffold. As ABH explains, Dermagraft "is designed to stimulate healing in two ways: first, its mesh material is gradually absorbed and the human cells grow into place and replace the damaged skin; and secondly, the living cells in Dermagraft produce many of the same proteins and growth factors found in healthy skin, which help replace and rebuild the damaged tissue in a diabetic foot ulcer." According to ABH, Dermagraft is used in conjunction with standard wound care regiments, and is "indicated for use in the treatment of full thickness diabetic foot ulcers greater than six weeks in duration which extends through the dermis, but without tendon, muscle, joint capsule, or bone exposure."

47.     ABH claims that Dermagraft is an effective treatment of diabetic foot ulcers, and it cites to a 2001 ABH clinical trial which showed that when compared with conventional therapy alone, the weekly application of Dermagraft for up to eight weeks together with conventional therapy significantly increased the closure of diabetic foot ulcers. Dermagraft, according to Shire, is a leading treatment in the slow healing segment of the diabetic foot ulcer market, and in 2011, it estimated that Dermagraft had a 5% share of that potential $3 billion market.

## ABH ILLEGALLY MARKETS DERMAGRAFT

48.     ABH illegally induced physicians and the staff with whom they work to provide treatment for diabetic foot ulcers using ABH's Dermagraft product through the use of illegal incentives, inducements, and services that constitute kickbacks.  As a result of ABH's illegal inducements, physicians treated diabetic foot ulcers using ABH's Dermagraft product on Medicare, Medicaid, and Veteran's Administration patients admitted at health care facilities around the country.  By doing so, ABH caused physicians, wound care centers, and hospitals to submit false claims for payments for the treatment of diabetic foot ulcers performed in violation of the Anti-Kickback Act.

### A. ABH'S SALES AND MARKETING ORGANIZATION

49.     The head of the sales division for Dermagraft is Senior Vice President of North American Sales, Keith O'Briant.  O'Briant joined ABH in October 2006, initially serving as Vice President of Sales, and assumed his present position in May 2009.  North American Sales is divided into three separate sections:  North American Sales Director West, North American Sales Director East, and North American Sales Director Federal.  Each of the Sales divisions is further subdivided by several Regional Sales Directors:  6 for the West; 5 for Federal; and 7 for the East. They are in turn responsible for the Sales Representatives who work under each of them.  The three sales divisions have an estimated 150 sales representatives altogether.

50.     Nick Rallo serves as North American Sales Director for the Eastern United States. He has been with the company for several years, and he hired Medolla.  Rallo was and is responsible for seven Regional Sales Directors and the roughly 50 sales representatives that report to them.

51.     ABH hired Medolla in February 2011.   He worked under Rallo and Pete Goodwyn, who was then Regional Sales Director for the Southeast.

52.     ABH employs a "top down" marketing organization, whereby a central marketing strategy is developed at the top with Senior Vice President and Sales Directors, and then pushed down to the Regional Sales Directors, who in turn instruct their sales representatives on the strategy, frequently at what are called, "Plan of Attack" meetings.

53.     ABH trained Medolla and other sales representatives in ABH's marketing strategy when he began with the company.   He also attended other company marketing meetings.   He frequently communicated with Rallo and Goodwyn and received numerous emails from them. ABH provided Medolla with numerous handouts and other materials about its marketing strategy.

## B. ABH MARKETING STRATEGY: THE FOUR PILLARS OF DERMAGRAFT

54.     ABH employed a marketing strategy referred to as the "Four Pillars of Dermagraft." The aim of the strategy was to "partner" with health care providers and their staff such that the providers would look to and rely upon the ABH sales representatives in all matters concerning the identification, use, billing, and profitability of Dermagraft.

55.     The "Four Pillars" consisted of (1) insurance verification; (2) case coverage;  (3) coding & documentation; and (4) reimbursement reviews.   By using the Four Pillar strategy, ABH sales representatives sought to insert themselves into the health care provider's practice and "control the process" relating to health care provider's use and billing of Dermagraft.   Once a sales representative controlled the process for use of Dermagraft at a "particular center," then according to ABH "you end up controlling the market potential within that center."

### i.     Pillar One:  Controlling Insurance Verification

56.     In Pillar One, ABH sought to "control the insurance verification process." Here, ABH's goal was to identify *in advance* the potential patients of a physician who could possibly benefit from Dermagraft and then pre-verify their insurance. The crucial step to accomplishing this goal was for the ABH sales representative to form relationships with the case managers, receptionists, or other personnel at a particular physician's practice (and ultimately with the physican). Once those relationships were formed, the sales representatives would educate them as to what patients could potentially benefit from Dermagraft, get the physican's staff to flag potential Dermagraft patients to the sales representatives, whereby the sales representative would then do "all paperwork" relating to verifying that the potential patient's insurer would cover the cost of using Dermagraft. ABH promised providers who used Dermagraft, "We will ensure that you have the most current verification to put in the patients chart *in order to stay ahead of the doctor's treatment plan.*" (emphasis added).

57.     Controlling insurance verification in advance of the physician actually prescribing Dermagraft permitted ABH's sales representatives to identify and "increase" the number of patient prospects in advance with the goal of "converting them to new starts" –referred to as "loading the pipeline." The "metrics of the model," ABH explained to its sales representatives, was for the representative's clients to submit two potential patients for insurance verification each day for a total of 40 each month. ABH expected that of these 40 patients, it could expect a yield of "13 new patient[s] started" which would lead to the use of "52 new pieces [of Dermagraft] in the first month" and "104 new pieces in subsequent months." If that model were achieved, then the sales representative could get commissions on each use of Dermagraft totaling $10,400 for that month or $204,800 annually.

58.    ABH instructed Medolla and other representatives on the key step to implementing Pillar 1: "Get your case manager organized. Have your nurse do one thing . . . identify the future patients and either fax them to you or place them in your basket." Essentially, ABH wanted the provider's case manager or other "spotter" as they were called to send its sales representative either "all new patient intakes" or at minimum "all [patients with] diabetic ulcers." The "ideal" patient potentials were those patients whose diabetic ulcers had not healed after 4 weeks and who were covered by Medicare with secondary coverage for the 20% portion that Medicare did not pay.

59.    Following ABH's written instructions, Medolla and other sales representatives would get the staff or case manager at the practice to either fax to them or set aside in a designated basket the "face" sheets for Dermagraft "potentials." Each sales representative had an "E-fax" account to which the case manager was to fax the face sheets. These face sheets contained private health related information obtained from the patient by the provider along with sufficient information to permit the verification of the patient's insurance coverage. ABH instructed its sales representatives to make sure that the face sheets reflected whether the patient had diabetes, the location of the diabetic ulcer, and the time of the next appointment. Medolla most often received face sheets from the providers by fax to his E-fax account.

60.    Once the sales representatives, including Medolla, received the face sheet, they were to fill out pre-printed and pre-signed blank insurance verification forms containing the physician's signature, fill in the patient's information, and submit it for verification. ABH instructed Medolla and other sales representatives to keep an "insurance verification" tracker sheet to track what was submitted. Sales representatives such as Medolla then provided the physician's practice with an "easy to read" color coded spread sheet: potentials whose insurers

provided 100% insurance coverage for Dermagraft were color coded in green; orange for partial coverage; and red for no coverage.  ABH's sales representatives further informed the practice as to "exact allowable rates" of reimbursement.  Based on presenting these pre-verification reports to providers, Medolla observed that roughly 80% of all Dermagraft eligible patients were Medicare recipients.

### ii.    Pillar Two:  Clinical Case Coverage

61.    In this second phase of its marketing plan, ABH sought to become a partner in the physician's treatment of the patient so as to maximize the use of Dermagraft.  To that end, ABH encouraged Medolla and its sales representatives generally to always be present and onsite for the patient's appointments with the physician; to always have the Dermagraft there and ready for application; to be present for the Dermagraft's application on the patient's diabetic ulcers; and to "provide guidance for when to start, stop or continue Dermagraft to ensure graft optimization."

62.    For example, obtaining the date *and time* in the face sheet for the potential patient's next appointment was a key component in carrying out ABH's marketing strategy. ABH sales representatives were instructed to implement an "A and P calendar systems" to track the appointments and status of Dermagraft "potentials" and "active [cases]" for time, date, physician, insurance coverage, patient id, and clinical status.  To convert a potential patient to one treated with Dermagraft, ABH sales representatives were to "track our 'P'otential patients until they are healed or label palliative."  As part of "tracking," the sales representative was to "1. Inspect ALL 'P'otential Patients; 2. Make notes and PLAN to return; and 3. Repeat until patient is healed or palliative."

63.    ABH instructed its sales representatives to show up at the provider's office at the potential patient's next appointment for the purpose of "visually inspecting" a potential's diabetic

foot ulcer.  The strategy was to get the physician or nurse to permit the sales representative to visually inspect the patient's diabetic ulcers so that they could, in turn, encourage the physician on the use of Dermagraft.  ABH told its sales representatives "BE THERE to inspect the 'P'otential 90-100s and CONVERT!"

64.     Calendaring Active and Potential patients and being present at the patient's appointment was instrumental for sales representatives and Medolla.  ABH's marketing materials admonish sales representatives, "Are my As and Ps in the correct time slots to promote our #1 Conversion Tip?  BE THERE" and "Learn To Leverage this Tool to Increase Your Pay and Be There!"

65.     Additionally, knowing when a patient would be present would permit the sales representatives, including Medolla, to have Dermagraft available and ready for use should the physician decide it was warranted for treatment.  Since the sales representative had already had the potential patient's insurance pre-verified for Dermagraft, the decision to use Dermagraft was an easy one for the physician, especially since the sales representative was there encouraging the product's use.  In fact, ABH's marketing materials complained that two of the "common reasons patients don't convert" from a potential to an active is "Lack of Representative control" and "NOT BEING THERE!!!"

66.     ABH sought to have its sales representatives, such as Medolla, looking over the physician's shoulder as he or she examined the potential patient's ulcers, and if they were suitable for Dermagraft, to be able to say, "doctor, this person looks like they could benefit from Dermagraft; their insurance would allow it – and I just happen to have some available right here."  ABH's sales representative would further encourage the use of the product by actually

thawing and preparing the graft for use and even "provide guidance with the proper dressings" to put on the grafted ulcer.

67.     In fact, to further promote the use of Dermagraft, ABH encouraged its sales representatives and Medolla to have specialized dressing materials or what were known as "off-loading boots"[4] available to provide to the physician free of charge for use on the patient.

68.     In wound care centers, ABH would often insure a pre-stocked supply of available Dermagraft by placing a rented freezer in the center where the sales representative would stock Dermagraft inventory.

69.     In tracking appointments and those patients who receive Dermagraft, called "Actives," sales representatives sought to find out and track the size of the patient's ulcers in order to promote the continued use of Dermagraft.  They are instructed, "I need to cover my As or they will not go on."

### iii.     Pillar Three: "We are Experts on Dermagraft Coding"

70.     To further promote the use of Dermagraft, ABH sought to insure that providers were compensated by insurers, including Medicare, for using its product.  ABH, therefore, sought to make sure that providers submitted bills that complied with the requirements of Medicare and other insurers.

71.     ABH instructed its sales representatives to assure providers that "we provide guidance during cases to ensure all coding is appropriate and documentation matches the codes used.  Our HE colleagues are available to do chart reviews to help fix/prevent issues that are many times sent down from your end coders.  We will ensure that your staff and providers are

---

[4]  A therapeutic shoe or boot that is specially cushioned to take the pressure off of the foot and wound and is frequently used in the treatment of diabetic foot ulcers.

always 'Medicare current' regarding QTRLY CMS/LCD changes pertaining to Dermagraft." ABH did not charge providers for conducting chart reviews.

72.     Along with providing free chart reviews to providers, ABH's sales representatives, including Medolla, conducted "spot checks" of patient progress notes to ensure the proper billing documentation for Dermagraft.  In one training presentation, ABH instructed Medolla and other sales representatives that one of the requirements for becoming a "Master of Coding and Documentation" was to "ROUTINELY perform[] documentation reviews" and asked them, "How are you able to get yourself in position to read the progress notes?"

73.     In a training Medolla attended, the ABH personnel leading it encouraged him and others to "ask to see the last date of service progress notes. . . . look[] to see if codes match up to what Medicare needs . . . don't know what it says (call RS [reimbursement specialists]) . . . but the client will think you're all over it . . . you are protecting them from the person upstairs . . . reviewing the dictation who can change codes on the superbill."

            **iv.     Pillar Four:  Business Reviews f/k/a "Revenue Reviews"**

74.     A key component of ABH's marketing plan was to periodically demonstrate to the wound care center and physician that they were making money using Dermagrafts and how much they were making.  By proactively showing these providers how much revenue they made using Dermagrafts, ABH sought to further incentivize providers to use their product.

75.     ABH's Fourth Pillar of its marketing plan promised that, "We proactively conduct routine reimbursement reviews for the center and the doctor to ensure reimbursement for Dermagraft is consistent with local LCDs [local coverage decisions]".

76.     ABH aimed to demonstrate the revenue obtained to the physicians attending Dermagraft patients at wound care centers ("WCC"), to the hospital's outpatient department ("HOPD"), and to the physician's office using the "three easy steps" method.

77.     In 2011, Medicare with secondary insurance together reimbursed the cost of each application of Dermagraft at $1554.20; that is $74 more than the $1470 that ABH charged the provider to purchase each Dermagraft application. In addition, Medicare paid the physician a fee of $120 for administering the graft in a hospital or $180 for administering the graft in the physician's office. Medicare also paid the hospital or wound care center $200 for administering the graft. Medicare approved up to 8 applications of Dermagraft, and in ABH's experience, patients averaged 5-6 applications of Dermagraft.

78.     With physicians who administered Dermagraft at wound care centers, Medolla and other sales representatives were instructed by ABH to "1. WHILE COVERING A CASE . . tell the doctor you are going to check to ensure he is getting properly reimbursed. 2. Ask who is in charge of billing at his office. 3. Call from the [wound care center] and speak with the biller. Send Love. Ask for 1 patient with specific [date of service]."

79.     With wound care centers that administered Dermagraft, Medolla and other sales representatives were instructed by ABH to "1. Schedule lunch like we usually do and INVITE the Biller and Coder. 2. Pick one patient and [date of service] for both Medicare and private. 3. Invite [reimbursement specialist] to lunch. Review the [explanation of benefits] and Claims. Build a relationship!!!"

80.     For a physician's office practice where Dermagraft are administered, ABH instructed "1. WHILE COVERING A CASE . . . conduct a 30 day invoice to [explanation of

benefits] Review.  2. Pull [explanations of benefits] off an inclusive invoice from Roxanne.  3. Rep matches EOB to Invoices and presents to the physician."

81.    To those physicians who used Dermagraft, ABH offer to "conduct routine 60/90 day [explanation of benefit] and CMS-1500[5] to ensure correct reimbursement so the doctor will always see a value in being part of your wound care team."  ABH offered to conduct a similar review for hospital wound care centers.

82.    ABH instructed Medolla and other sales representatives to inform providers that in the event they did not receive reimbursement using Dermagraft after having obtained pre-verification from ABH, that ABH would cover that lost reimbursement.

### C. "SHOWING THE LOVE" TO PROVIDERS

83.    ABH put its sales representatives, including Medolla, under tremendous pressure to sell Dermagrafts:  they had a quota to sell 100 grafts each month.  For each graft sold, ABH paid them a commission of $100.  If they failed to meet their quota for a few months, ABH moved them out.  To meet their quotas, Medolla and other sales representatives had to "re-load the pipeline" of potential patients each month so that a portion of them could be successfully "converted" to using Dermagraft.

84.    For its Four Pillar Marketing strategy to work and sales representatives to form the "partnership" that ABH promised providers, ABH sales representatives had to form close relationships with the providers and their staff.  That is, to sell Dermagraft at the rates sought by ABH, sales representatives had to obtain the trust and close relationships that would allow them the access they needed:  access to patient files so they could pre-verify insurance and suitability

---

[5] The CMS-1500 form is the standard claim form used by a non-institutional provider or supplier to bill Medicare carriers and durable medical equipment regional carriers when a provider qualifies for a waiver from the Administrative Simplification Compliance Act requirement for electronic submission of claims  It is also used for billing of some Medicaid State Agencies.  See CMS.gov
www.cms.gov/ElectronicBillingEDITrans/16_1500.asp

for Dermagraft; to appointment times, so they could be present when the "potential" patient showed up in order to view their ulcers and suitability for Dermagraft; to the physicians, so that they could convince them to use Dermagraft and to keep using it for as long as permitted by insurance;[6] and to billing records and clinical notes so that they could ensure reimbursement and demonstrate the profitability of using Dermagraft.

85.    To form the relationships needed to achieve these goals, ABH instructed Medolla and its sales representatives that they must become "Expert in Building Profitable Relationships" and in so doing, they were to

- Master . . . the "show love" concept to all staff that supports you and/or Dermagraft.

- Create[] an environment (inside and outside the client) that allows for access that is not granted elsewhere.

- Builds relationships that are ready to [be] leveraged at ANY time.

86.    To "show love," ABH encouraged and expected Medolla and other sales representatives to provide a whole host of gifts and other incentives to providers and their staffs in order to create the relationships needed to sell Dermagraft. "Showing love" was the key ingredient for making the entire marketing strategy work, and in training Medolla and other sales representatives on the Four Pillars, ABH used the slogan, "Everyone must feel your love."

87.    Accordingly, in "showing love" ABH sales representatives, including Medolla, provided such gifts and incentives as

- Breakfast and lunches for office staff delivered at the office
- "Happy hours" for nurses and others to attend where ABH sales representatives would pick up the tab

---

[6] ABH gave its sales representatives "depth gauges" so that they could measure the size of the ulcers to determine their suitability for the use of Dermagraft. Additionally, ABH encouraged its sales representatives to take pictures of the ulcers which could then be used to show the need for Dermagraft and the progress toward closing a wound by using Dermagraft.

- Spas, pedicures, manicures
- Movie night out with family
- Tickets to sporting events to staff and physicians and their guests
- Expensive dinners
- Speaker programs and the payment of "honorariums" to physicians and paying for their guests to attend as well.
- Fishing trips
- Birthday presents
- Payment of grants or contributions to programs.

88.     ABH instructed Medolla and other sales representatives how to "show love" with such gifts at a regional sales meeting attended by 10-12 southeast sales representatives.

89.     In addition to these, ABH personnel mentioned to Medolla that the common practice of providing physicians and staff with gift cards had given way to less obvious forms of love. In turn, he also heard that ABH sales representatives had even given expensive guns to physicians to show love.

90.     The incentives listed above that ABH employed to build and leverage relationships in order to promote the use of Dermagraft are in addition to those already mentioned: (i) providing credits for nonreimbursed and, in some instances, even reimbursed grafts; (ii) providing physicians with free dressings in order to use Dermagraft; (iii) providing free "reimbursement reviews" to demonstrate the profitability of using Dermagraft; (iv) letting ABH "do the paperwork" by permitting sales representatives to pre-verify insurance for potential payments; and (v) providing free assistance with coding and review of patient files to make sure they were properly coded.

91.    As ABH explained in one training to sales representatives, "It's all about relationships and service" and then detailed some of the measures they were to take to build such relationships and provide service:

- At least two nights a week out with customers
- One on one dinners ([regional sales director] included?)
- Round table discussions with Dermagraft supports
- Nurses night out
- [Standard of care] dinners
- Birthdays, holidays, etc.
- Support their centers!
- Grants
- Develop speakers/[key opinion leaders]
- CME opportunities
- Ad board meetings –LaJolla?
- Referral programs
- Marketing opportunities
- Align your goals with theirs
- Become a true business partner.

92.    In another section of training materials, ABH discussed "profitable relationships," and asked "When was the last time you showed your top 10 nurses that you care more than the comp?" In response, ABH stated, "70% of the dollar goes to develop and 'love' on the important case manager" and "30% of the dollar goes to develop and 'love' on the provider."

93.    For example, in May 2011, on the date of Cinco De Mayo, Rallo, head of national sales for the east, admonished the regional sales directors that it was "a good night to show love and ask our case managers to dig up some wounds for us!  Margaritas with a dash to exudate!" The regional sales director for the southeast region chimed in, "Team this is a great day to build

some relationships . . .It's not only nurses week but also the Mexican New Year.  Use it to get'em out."

94.     In another instance, Rallo talked about recruiting physicians, often referred to as "whales" denoting their status as a large user of or referral source for Dermagraft, to ABH's "Ad" or advisory board wherein they would be flown to California to attend a meeting from 8-3 on Friday.   In addition to the payment of travel, ABH paid them "$1000 for time and participation."  The physicians who were targeted to attend where those physicians "whose ICD9 code suggests have the highest number of [diabetic foot ulcers] annually" and others who the sales staff were to suggest, though they were to rank the physicians on whether they were a "heavy Dermagraft user" or "dabbler."

95.     ABH frequently employed seminars and other meetings such as "marketing input" meetings, "Standard of Care" or "SOC" meetings, "AD Board meetings."   The ostensible purpose of such meetings was for the physician to provide a service to ABH:  to advise the company on marketing its product at "marketing meetings;" to hear about how Dermagraft should be used and properly applied at "SOC meetings;" and to give a talk or presentation at "AD board meetings."  Yet, ABH's true purpose in holding such meetings was to induce referrals and to find ways to pay physicians for their time in hearing about Dermagraft.  For example, Goodwyn tells his sales team in one email, "Team, this [marketing regional] advisory panel is a great opportunity to get our [key opinion leader's] out and feel some love."  In another instances, Goodwyn writes Rallo, Medolla, and others about "speaker training" in La Jolla:

> All five of our speakers were well taken care of throughout the training and all had nothing but positive feedback to offer me, Nick, and Keith.  Now it's up to you to follow up and capitalize.  I would like each of you to call your speaker tomorrow morning . . . . Please keep in mind that they all received the Dermagraft story from top to bottom . . . Please let your speaker know tomorrow when you will physically be with him this week and plan on spending clinic time with a goal of identifying new patients. . . . . . I would

like for you to begin planning on how to capitalize on their advocacy to Dermagraft in the months to come. . . . . . . let's get after these guys and make them whales.

96.     Medolla's Regional Sales Director Pete Goodwyn frequently spoke to this sales representatives in his division about showing the love: (i) in an email to the regional sales directors about a conference call follow up in February 2011, he asked, "When's the last time you 'showed the love' to one of your top 5 accounts?  Plan for it in your AP calendar!" (ii) in a call with sales representatives in March 2011, he asked all them to be ready on a call to tell him "who are you planning to take to dinner this week?" (iii) in another email in conjunction with a conference in July 2011, he told them, "Guys:  I need cell numbers, dinner confirmations for Thursday and Friday, and where your [key opinion leaders] is staying . . . I'll be in Boston on Wednesday to deliver welcome packages and start the 'love' . . ." (iv) presenting his sales representatives with a list of physicians attending a conference, Goodwyn tells the sales representatives, "Guys:  Please scrub this list and let me know who needs love.  This meeting is in two weeks."

97.     In developing the Tampa Bay region for ABH, Medolla followed ABH's training as he sought to develop relationships first with the staff and nurses of the physician practices and wound care centers so that they would act as "spotters" and send him the face sheets of "potentials."  Additionally, by further leveraging his relationships with them, Medolla followed ABH standard practice by getting "clinical" hours at the practices he was courting and got staff to vouch for him to the physician.

98.     Medolla showed the love by such things as bringing in food and setting up breakfasts; frequently showing up at provider with lunch for the staff; taking case managers and physicians to sporting events; chartering one physician's boat for a fishing trip; putting on numerous "Happy Hours" for staff and their friends; arranging for honorariums paid to

physicians for speaking at ABH events; wining and dining physicians with liquor and expensive dinners often under the guise of "training;" and provided physicians with free dressings as well.

99.     Following ABH's marketing methods detailed above, Medolla was able to turn the Tampa Bay region into a profitable one for ABH, achieving his monthly quota after four months on the job. His "clients" were typical of those to whom ABH sells Dermagraft: mainly wound care centers affiliated with hospitals along with the physicians that used the centers, a few hospitals, and a handful of podiatrists' practices.

### D.  USING THE MAGIC WAND

100.     Medolla's success at building relationships reflected ABH's commitment to him to pay whatever "love" related expenses were necessary to foster and establish the relationships with providers.  Goodwyn told Medolla when he started, "consider yourself as having a blank check" to expense reports, "you have [our] complete support,"  and to "get'em [the doctors and nurses] out every night;" "happy hours are a must;" and "schedule as many afterhours things as you can with every account."

101.     Though he was able to spend whatever he needed to "show love," Medolla's superiors informed him that certain expenses would not be reimbursed by ABH unless they were disguised.  To use the "wand," short for magic wand, meant to produce a false receipt in order to obtain reimbursement for items not normally reimbursed by the  company's accountants payable personnel.

102.     The wand was a WORD program that permitted the user to create false receipts for reimbursement.  When it was sent to him, Medolla was told by Rallo, "be very careful with this.  Only key people have it.  Change fonts, names, and other identifying information.  Print out on regular paper, crumble it, step on it, and throw it against the wall.  Then submit it for

reimbursement by fax on the lowest resolution." Altogether, Medolla used the wand as instructed to obtain reimbursement of $8,815 in "meals," though he had in fact spent the money on marketing related expenses such as a fishing trip, season tickets, medical supplies, and boating expenses.

## E. ABH'S ILLEGAL MARKETING HAS RESULTED IN SPECTACULAR GROWTH IN DERMAGRAFT SALES

103. Due to ABH's marketing tactics, Dermagraft sales experienced tremendous growth in the last five years. ABH sold 10,524 Dermagraft "pieces" in 2007. By 2011, that number had increased to 136,712 pieces, a 1199% increase in 5 years.

104. ABH's sales of Dermagraft in Florida mirrored the national trend. ABH sold 1,112 Dermagraft pieces in Florida in 2007. By 2011, the number of Dermagraft sales in Florida had increased to 9,671, a 770% increase in 5 years.

80. Assuming an average sale price of Dermagraft is $1,350, then ABH generated roughly $467,534,000 in sales over 5 years. If 80% of those sales were to patients covered by Medicare, then Medicare paid $374,000,000 for the cost of Dermagraft alone, not including the costs Medicare reimbursed providers for their applications of Dermagraft.

## F. ABH ENGAGED IN A SCHEME TO CAUSE THE SUBMISSION OF FALSE CLAIMS TO MEDICARE AND OTHER FEDERAL PROGRAMS

105. As detailed above, ABH knowingly, willfully and pervasively paid illegal incentives and provided unlawful inducements to physicians, nurses, and staff for the purpose of promoting the use of Dermagraft on patients whose care was paid for by Medicare, VHA, and other federally-funded insurance.

106. In addition, with its Four Pillar marketing strategy employed nationwide and having pre-verified the insurance of patients using Dermagraft, ABH knew that providers would

submit claims for reimbursement to federal payors such as Medicare, the VA, and other federally funded insurance.

107.    The payment of illegal incentives by ABH to promote the use of Dermagraft violated the Anti-Kickback Act, and as a result, the claims by providers for reimbursement made to Medicare violated a condition of payment in their Medicare provider agreements wherein providers agreed and certified that they would

> abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

In turn, the providers who received illegal incentives from ABH throughout the country falsely certified their compliance with Medicare laws, including the Anti-Kickback Act, when they submitted claims to Medicare for reimbursements relating to Dermagraft.

108.    By offering and paying illegal incentives and inducements, ABH also caused providers to violate the conditions of payment for the claims submitted to other federal payors such as the VHA, TRICARE, and other federal insurance programs.   By offering and paying illegal incentives and inducements to providers to falsely certify, ABH caused these providers to falsely certify compliance with the Anti-Kickback Act.

109.    The scheme to cause the filing of false claims described herein was pervasive and nationwide and took place from when ABH first began marketing Dermagraft in 2007, and to Medolla's knowledge is still ongoing.   The full details of the scheme are in the exclusive possession of ABH.

**COUNT I:  VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**

110.    The allegations of the foregoing paragraphs are realleged as if fully set forth herein.

111.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), imposes liability upon those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim.

112.    ABH knowingly engaged a concerted campaign to induce physicians to treat their patients with diabetic ulcers with its Dermagraft product by paying illegal incentives and inducements that constitute "kickbacks."

113.    Claims for payment to federally-financed healthcare systems, to include at least Medicare, the VHA, and TRICARE, which resulted from ABH's illegal marketing campaign were false claims, submitted in violation of 31 U.S.C. § 3729(a)(1).

114.    The false certifications by providers that they complied with the Anti-Kickback Act was and is material to the payment of false claims submitted by these providers.  The United States, whether through Medicare, the VHA, or other federal insurance such as TRICARE, would not have paid for Dermagraft and its treatment had it known the use of this medical device resulted from or was prompted by the payment of illegal incentives and inducements to the providers.  As a result, the United States has been harmed in an amount equal to the value paid by the United States to reimburse or cover these Dermagraft related claims.

115.    The United States has been damaged as a result of ABH's conduct in violating the False Claims Act in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests

1.      That the Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of ABH's actions;

2.      That the maximum civil penalties allowable be imposed for each and every action in violation of 31 U.S.C. § 3729;

3.      That the Court award pre- and post-judgment interest, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

4.      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

5.      That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

6.      That the United States Government and Relator receive all relief, both at law and in equity, to which they may reasonably appear to be entitled or to which the Court deems proper.

Respectfully submitted,

Dated: March 15, 2012

_____
Jeffrey G. Brown, Esq.
Brown & Doherty, P.A.
Fla. Bar No. 832431
450 Carillon Pkwy Ste 120
Saint Petersburg, FL 33716
727-299-0099 (p)
727-299-0044 (f)
jeff@brownanddoherty.com

*Counsel for Joseph J. Medolla*

I hereby certify that pursuant to Rule 4(i)(1) [f/k/a 4(d)(4)], Federal Rules of Civil Procedure, I served the original of this Complaint via Hand Delivery on Robert E. O'Neill, U.S. Attorney for the Middle District of Florida, 400 N. Tampa St., Suite 3200, Tampa, FL 33602 and by Certified Mail Return Receipt Requested to Eric Holder, U.S. Attorney General, Department of Justice, 950 Pennsylvania Ave., N.W., Washington, D.C. 20530-0001 on this 15 of March, 2012.

_____
Jeffrey G. Brown, Esq.